**CODELL CONSTRUCTION COMPANY,**
**Appellant,**

**v.**

**Clyde DIXON, Kentucky Workmen's Compensation Board, etc. and Special Fund, Appellees.**

Court of Appeals of Kentucky.

March 17, 1972.

James B. Stewart, White, McCann & Stewart, Winchester, for appellant.

Noble & Noble, Hazard, James F. Perkins, Gemma M. Harding, Dept. of Labor, Louisville, for appellees.

PALMORE, Judge.

As a result of an injury sustained at work Clyde Dixon filed a workmen's compensation claim against his employer, Codell Construction Company. Because of a previous injury the Special Fund eventually was made a party. KRS 342.120(1). The Board made an award for temporary total disability and found that Dixon had not sustained any permanent disability. His appeal to the circuit court resulted in a judgment remanding the case to the Board with directions that it make an award for permanent disability under the principles of Osborne v. Johnson, Ky., 432 S.W.2d 800 (1968). The employer appeals, contending that the evidence did not require a finding of permanent occupational disability within the meaning of that case.

The factual circumstance which brings the controversy into focus is that after recovering from the injury the claimant was able to resume the same employment at no reduction in his earnings. The relevant principle stated in Osborne v. Johnson is this: "While a workman who has sustained a permanent bodily injury *of appreciable proportions* may suffer no reduction

of immediate earning capacity, it is likely that his ultimate earning capacity will be reduced either by a shortening of his work life or a reduction of employment opportunities through a combination of age and physical impairment. Accordingly, it is our opinion that in those instances in which the workman has sustained no loss of immediate earning capacity but has incurred a permanent injury *of appreciable proportions,* the Workmen's Compensation Board . . . . can and should make an allowance for some degree of permanent partial disability on the basis of the probability of future impairment of earning capacity as indicated by the nature of the injury, the age of the workman, and other relevant factors." (Emphasis added.) 432 S.W.2d at 804.

To pinpoint the issue presented by this case, the employer contends that although Dixon may have sustained some degree of permanent injury from the accident, the evidence does not force a conclusion that it was "of appreciable proportions." (Adjectives do come back to haunt us.) The claimant contends of course that it does, and the circuit court so held.

Dixon is a welder. In February of 1969, when the claim was filed, he was 48 years old. On August 15, 1967, he hurt his back in lifting a heavy piece of metal. He was hospitalized for two weeks and was unable to resume his work until May 6, 1968. This is the period of time to which the board limited his award.

The accident of August 15, 1967, apparently resulted in an injured disc at L–4 on the left side. Dixon was treated by Dr. Franklin Jelsma, of Louisville, a specialist in diseases and surgery of the nervous system. In 1954 the claimant had sustained a disc injury at L–5 on the right side and Dr. Jelsma had removed the disc. That operation proved to be very successful, and Dixon had no further trouble with his back until August 15, 1967.

Dixon continued to work for Codell on a full-time basis from May 6, 1968, until August 12, 1969, when he was laid off because Codell no longer had any work for him. He testified that although he had continued to work he suffered great pain in so doing and could not lift as he had been able to do before.

It was the opinion of Dr. Jelsma that as a result of the August 15, 1967, injury Dixon had suffered a permanent functional impairment of 25% to the body as a whole, none of which was attributable to the 1954 injury and operation. With reference to the fact that he was working at the same employment as before, Dr. Jelsma commented as follows:

"You say well, he's able to work, that's fine, some patients have a desire to work and will to work and will work and are able to work, even though they do have a structural disability.

"Many people that are anatomically or structurally disturbed are able to work, but potentially this man has, as a result of these two injuries, in my opinion, two different types of disabilities, one originating from the '54 and one originating from the '67. Now, I think any place where he may go to work or apply for a job, would take into consideration both of these injuries, most of them will.

"On the other hand, from the standpoint of rehabilitation, we have people that are hardly able to move about, that are able to work and continue to work in some capacity. If he's able to do his welding, which I suppose he is doing, I'm glad to hear that, I think that's fine. That doesn't require heavy lifting and I don't think he's on the market competing with people that do heavy work and I think with his type of work he can—he can continue and I hope he will."

Dr. Ralph Angelucci, a neurosurgeon of Lexington, Kentucky, examined Dixon in behalf of the employer on December 26, 1967, April 18, 1968, and July 10, 1969. On the first of those three occasions the claimant was wearing a low back corset,

had considerable limitation in forward bending of the low back, and evinced other symptoms extending particularly into the left leg. Xrays made at the time disclosed some narrowing of the L–4 and L–5 interspaces. According to the case history as recorded by the doctor, Dixon reported that a myelogram had been done while he was hospitalized in Louisville, and, assuming the myelogram to have been normal, Dr. Angelucci diagnosed a chronic lumbosacral strain and recommended conservative treatment consisting of physical exercises. Actually, however, Dixon had not had a myelogram.

In April of 1968 Dixon had gained 20 pounds and displayed about the same symptoms as in December of 1967. At this time Dr. Angelucci suggested that he try returning to work and that another myelography would be advisable if the trouble continued.

At the July 1969 visit Dixon told Dr. Angelucci he had gone back to work and was having more pain in his back and left leg than in April of 1968. According to the doctor, however, he did not appear to be in pain or distress, and could bend forward "to within six inches of the floor. There was no tenderness, spasm or other abnormality . . . He had no fascillations [sic], fibrillations, or other abnormal neurological findings in the lower extremities. The reflexes revealed once again the right ankle jerk which he had shown on his previous examination and which I attributed to his original disc injury of some 14 or 15 years previously. His sensory examination once again revealed hypesthesia of the left lower extremity to the mid abdominal area. Xrays of the lumbosacral spine once again revealed narrowing of the L–5 interspace. He seemed to be remarkably improved and must have been because he was working at his original occupation and I could find no signs on this last examination in July of 1969 of a herniated disc syndrome . . . his complaints of low back pain and radiculitis to the left lower extremity were suggestive of nerve root compression probably due to a disc protrusion but his findings did not substantiate this."

Dr. Angelucci's opinion on the critical point of the case was that Dixon does not have a disability, for the reason that he is still able to do the same work as before:

Q– "Do you base your opinion that the plaintiff had no disability as a result of this injury of August 15, 1967, on the fact that he had returned to work as a welder?"

A– "Yes."

.    .    .    .    .    .

Q– "Is it possible that the plaintiff could have a disability even though he returned to work as a welder?"

A– "Yes."

.    .    .    .    .    .

Q– "Do injuries of this type after a person has returned to work often times reassert themselves?"

A– "Can they reoccur?"

Q– "Yes."

A– "Yes."

.    .    .    .    .    .

Q– "Do you assign any permanent partial disability to this man as a result of the second injury?"

A– "No, there I said no because he has gone back to his previous occupation."

Q– "I believe Mr. Noble has asked you if that was probably your principal reason in not assigning any disability because he did return to work, is that correct?"

A– "Yes."

With respect to the fact that in July of 1969, when last examined, Dixon still showed diminished sensitivity to pain, or slight numbness, of the left leg, Dr. Angelucci said, "I couldn't account for it .  .  .  .  it didn't fit the usual outline.

When a person has a numbness in association with nerve root compression the numbness corresponds to the dermatone or the skin distribution of that particular nerve and it is not stocking in type and his hypesthesia, as I recall, on three occasions was numbness of the entire left lower extremity up to about the level of the upper third of the left thigh, more like a stocking type hypesthesia and this doesn't correspond to a particular nerve root distribution."

We have gone into Dr. Angelucci's testimony at some length because without it we believe the weight of the evidence as a whole probably would require a finding of permanent disability in some degree. There are, to be sure, certain other equivocal circumstances that may reflect infavorably against the genuineness of the claim, but they are almost in the "red herring" category. If the Board's findings are to be sustained, it must be largely on the basis of Dr. Angelucci's testimony and the fact that Dixon was able to resume work and continue working for a sustained period of time until laid off for reasons having nothing to do with his capacity to perform.

Among other things, Dixon was involved in an automobile accident on December 2, 1967, and received a neck injury for which he was treated by Dr. Eugene Parr, of Lexington. At first he complained also of low back pain, but these symptoms soon disappeared and this doctor's attentions were concentrated on the cervical area. The equivocal aspect of this episode is that Dixon did not inform Dr. Parr of his back injury suffered in August of 1967 and, after the first visit or so, ceased complaining of any back symptoms. Meanwhile, of course, Dr. Jelsma had been treating him for the back injury. In fact, on December 4, 1967, which was two days after the automobile accident and one day before he went to Dr. Parr, Dixon had seen Dr. Jelsma and was wearing his back brace. He did not tell Dr. Jelsma of the automobile accident and did not tell Dr. Parr of the

August, 1967, back injury. Evidently he neglected to wear the back brace while visiting Dr. Parr. As of the time this proceeding was being conducted he had a lawsuit pending in which he was seeking recovery for the injury sustained in the automobile accident.

After the Special Fund had been made a party Dr. Robert Sexton, a neurological surgeon of Louisville, was appointed under KRS 342.121. He examined Dixon on January 15, 1970, and concluded that the patient had a 30% permanent partial impairment resulting wholly from the injury of August 15, 1967, a 15% permanent partial impairment resulting from his 1954 injury and operation, and a 40% permanent partial impairment attributable to a combination of the two. Again, as in the instance of Dr. Angelucci, Dr. Sexton's recorded case history indicates that Dixon reported having had a myelography at Louisville in 1967. For what it is worth, Dixon made no mention of the automobile accident. Dr. Sexton said that the existence or nonexistence of a myelogram would have made no difference unless he had known what it showed, but that possibly the man's having said he had one, when in fact he had not, might have cast some doubt on the accuracy of the case history. In any event, there seems to be little question that upon the basis of his own examination together with the case history Dr. Sexton did conclude that Dixon has a substantial and permanent functional impairment attributable to the August 15, 1967, injury.

■ The circuit court concluded that in finding Dixon had no disability because he was able to resume his normal occupation Dr. Angelucci in effect took upon himself the Board's function of determining occupational as distinguished from functional disability, and that his opinion therefore does not have substantial probative value. To the extent that his opinion of disability rests on the premise that Dixon was able to work we agree. Nevertheless, disregarding this ultimate opinion, the observa-

tions made by Dr. Angelucci in the course of his three examinations do have probative value, and except for the fact that he was proceeding under the assumption that there had been a myelogram showing no abnormalities these observations clearly suggest that he could not find much wrong with Dixon except for a chronic lumbo-sacral strain. The limitation in forward bending had virtually disappeared, and he could not associate the slight numbness of the left leg with any specific spinal involvement.

As triers of fact the members of this court might very well have made a finding different from that of the Board. However, it has often been observed that the Board has considerable leeway in its factual determinations. It is not obliged either to accept or to disregard the testimony of one expert as against another. We have been liberal in upholding its findings when favorable to the claimant. See, for example, Hawkins Brothers Coal Company v. Thacker, Ky., 468 S.W.2d 256 (1971); Island Creek Coal Co. v. Williams, Ky., 469 S.W.2d 64; and Harry Gordon Scrap Materials, Inc. v. Davis, Ky., 478 S.W.2d 731 (decided today). It must not be overlooked, however, that in this instance its finding (on the question of permanency) was against the plaintiff, who had the burden of proof and risk of nonpersuasion. We are unable to say it was clearly unreasonable for the Board to reach the same conclusion as did Dr. Angelucci.

It is our opinion that the evidence as a whole leaves enough doubt of Dixon's having sustained a substantial permanent injury to justify the Board's inability to find a permanent occupational disability.

The judgment is reversed with directions to sustain the award of the Workmen's Compensation Board.

All concur.